

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

**FILED**

vs.

**MAR 3 1 2000**

AUDREY YU and
DAVID CHANG,
   **Defendants**

**AT 8:30** .............. **M**
**WILLIAM T. WALSH**
**CLERK**

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Hon. Alfred M. Wolin

Crim. No.  99-726 (AMW)

18 U.S.C. § 371,
18 U.S.C. § 1001,
18 U.S.C. § 1503,
18 U.S.C. § 1512(b)(1),
18 U.S.C. § 1512(b)(2)(A),
18 U.S.C. § 1623, and
18 U.S.C. § 2.

# SECOND SUPERSEDING INDICTMENT

The United States Grand Jury for the District of New Jersey, sitting in Newark, charges:

## INTRODUCTION

At all times material to this Second Superseding Indictment:

1. Defendant AUDREY YU (hereinafter "AUDREY YU") was an employee, officer, and

agent of Nikko Enterprises Inc. ("Nikko"), The Bright & Bright Corporation ("Bright &

Bright"), Panacom Inc. ("Panacom"), and Hudson Terrace Realty Management Corp.

("Hudson").  The offices for these entities were located, at various times, at 464 Hudson

Terrace in Englewood Cliffs, New Jersey, in the District of New Jersey (hereinafter "464

Hudson Terrace").

2. Defendant DAVID CHANG (hereinafter "DAVID CHANG") was a shareholder, officer

and senior advisor to Nikko, Bright & Bright, Panacom, and Hudson.

3. Berek Don, an unindicted co-conspirator herein, was a resident of Fort Lee, New Jersey,

and was an attorney admitted to the practice of law in the State of New Jersey.  Berek

-1-

Don was a partner in the law firm of Smith, Don, Alampi, D'Argenio & Arturi and served as the Bergen County Republican Chairman and the municipal attorney for the Town of Fort Lee.

4.   Carmine Alampi, an unindicted co-conspirator herein, was a resident of Englewood Cliffs, New Jersey, and was an attorney admitted to the practice of law in the State of New Jersey. Carmine Alampi was a partner in the law firm of Smith, Don, Alampi, D'Argenio & Arturi and served as Bergen County Democratic Treasurer. Carmine Alampi was also a member of the Torricelli Campaign Finance Committee.

5.   The law firm of Smith, Don, Alampi, D'Argenio & Arturi (the Don/Alampi Law Firm) represented DAVID CHANG, Nikko, Bright & Bright, and other entities associated with DAVID CHANG. Some of these entities paid a monthly retainer to the Don/Alampi Law Firm. DAVID CHANG also did business with Berek Don outside their lawyer-client relationship. The Don/Alampi Law Firm's offices were located in Englewood Cliffs, Bergen County, New Jersey, in the District of New Jersey.

6.   A person known to the grand jury (hereinafter referred to as the "Chairman") was named the Chairman of Nikko, Bright & Bright and Panacom.

7.   AUDREY YU was employed by, or an agent of, Nikko, Bright & Bright, Panacom, and Hudson companies. AUDREY YU performed office management duties, including, but not limited to, general bookkeeping, maintaining the filing systems, and communications with clients and tenants. In all of these entities, AUDREY YU worked for and with, and was a close associate of DAVID CHANG's.

**The 1996 New Jersey Senatorial Election:**

8.     Robert G. Torricelli was a candidate for United States Senate from New Jersey during the campaign preceding the 1996 federal election.  Torricelli for U.S. Senate, Inc. (the "Torricelli Campaign") was a political committee authorized to support his candidacy. The Torricelli Campaign was subject to the reporting provisions and campaign financing limitations of the Federal Election Campaign Act (FECA).

9.     The Torricelli Campaign had a Finance Committee which was comprised of a group of individuals that met in the offices of a Newark, New Jersey, law firm.  The Torricelli Campaign used a coding system to maintain an account of the money each member of the Finance Committee raised.  DAVID CHANG was a member of the Torricelli Campaign Finance Committee.

10.    The FECA, Title 2, United States Code, Section 431 et seq., and, in particular, Title 2, United States Code, 441b(a), specifically prohibited corporations from making contributions or expenditures in connection with the nomination and election of candidates for federal office.  Section 441b(a) also forbade any officer of a corporation to consent to a prohibited contribution or expenditure.

11.    The FECA, in particular Title 2, United States Code, Section 441a(a)(1), specifically prohibited individuals from contributing more than $1,000 to any federal candidate for a single election.  Prior to the primary election, individuals could contribute $1,000 each for the primary and general elections, for a total of $2,000 per candidate in an election cycle.

12. The FECA, in particular Title 2, United States Code, Section 441f, specifically prohibited any person from making a contribution in the name of another person or knowingly permitting his or her name to be used to effect such a contribution. Section 441f was violated if a person gave funds to a straw donor, known as a"conduit", for the purpose of having the conduit pass the funds on to a federal candidate as the conduit's own contribution. A violation also would occur if a person reimbursed a donor who already had given to a candidate, thereby converting the donor's contribution to his or her own.

13. The FECA, in particular Title 2, United States Code, Section 434, required that each treasurer of a political committee file periodic reports of receipts and disbursements, which reports were to identify each person who made a contribution to such committee during the relevant reporting period whose contribution or contributions had an aggregate amount or value in excess of $200 within the calendar year, together with the date and the amount of any such contribution. Expenses paid on behalf of a campaign were to be reported in the name of the individuals who contributed such expenses as an "in-kind" contributions.

14. Statements and reports required to be filed under the FECA by a candidate for the office of Senator were to be filed with the Office of the Secretary of the Senate, who receives such statements and reports as custodian for the FEC. The Office of the Secretary of the Senate is required to forward a copy of any FECA statement or report its receives as soon as possible, but no later than two days after receiving such statements and reports. The Treasurer of the Torricelli Campaign, or the designated Assistant Treasurer (hereinafter

-4-

collectively "the Treasurer"), was required by federal law to file a 1995 year-end report with the Office of the Secretary of the United States Senate, as custodian for the FEC, which information would also be transmitted to the FEC, no later than January 31, 1996. The Treasurer of the Torricelli Campaign was also required by federal law to file quarterly reports with the Office of the Secretary of the Senate, as custodian for the FEC, no later than April 15, July 15, and October 15, 1996, and January 31, 1997, respectively. The Treasurer of the Torricelli Campaign was further required to file certain other reports with the Office of the Secretary of the Senate and to answer inquires about its reports from the FEC.

15.     The Federal Election Commission ("FEC") was an agency of the United States government, headquartered in Washington, D.C., and entrusted with the responsibility of enforcing the reporting requirements of the FECA and of directing, investigating and instituting civil enforcement actions with respect to violations of the FECA. In addition, the FEC was responsible for making available to the public specific information about the amounts and sources of political contributions to federal candidates and their political committees.

**Prior Federal Grand Jury Investigation**:

16.     Beginning in about January 1997, the United States Attorney's Office for the District of New Jersey (the "U.S. Attorney's Office"), in conjunction with federal law enforcement agencies and a federal grand jury for the District of New Jersey, was conducting an investigation into a mortgage transaction involving Berek Don and loans to Berek Don from DAVID CHANG and Bright & Bright.

17.     On about January 23, 1997, DAVID CHANG accepted service of a grand jury subpoena
        issued in the District of New Jersey (hereinafter the First Grand Jury Subpoena) which
        required that DAVID CHANG produce, in part, "any and all records related in any way
        to ... loans and/or payments made to Berek Don by David Chang and/or Nikko
        Enterprises."

18.     On or about March 13, 1997, DAVID CHANG authorized an attorney acting on behalf of
        himself, Nikko, and Bright & Bright to accept service of another grand jury subpoena
        issued in the District of New Jersey (hereinafter the "Second Grand Jury Subpoena").
        The Second Grand Jury Subpoena required the production of certain financial
        documents, including, for the period between January 1, 1994, and March 13, 1997,
        "cancelled (sic) checks and corresponding check stubs or check logs."

19.     On or about June 10, 1998, DAVID CHANG authorized an attorney representing himself
        and Bright & Bright to accept service of a third grand jury subpoena issued in the District
        of New Jersey (hereinafter the "Third Grand Jury Subpoena") requiring "David Chang as
        Custodian of Records for Bright & Bright Corp" to produce, in part, "All original
        cancelled (sic) checks drawn on Bright & Bright account # 021207167 at Bridge View
        Bank for the period June 1, 1996, through and including August 1, 1996." By this time
        the prior grand jury's investigation had expanded to included allegations of illegal
        campaign contributions to the 1996 Torricelli Campaign.

**Present Federal Grand Jury Investigation:**

20.     On or about February 5, 1999, a federal grand jury was empaneled in Newark, New
        Jersey, in the District of New Jersey (hereinafter "the Grand Jury") and continued an

-6-

investigation conducted by the prior District of New Jersey grand jury into allegations

that DAVID CHANG, Berek Don and others violated campaign financing and other

federal laws. The Grand Jury's investigation included, among other matters, the

circumstances surrounding the making of the Bright & Bright check numbered 3945, in

the amount of $11,000. The Grand Jury was also investigating the circumstances

surrounding other transactions conducted in the name of Nikko and Bright & Bright, as

well other entities and persons related to Nikko, Bright & Bright, and DAVID CHANG,

to determine, in part, who may have been reimbursed for their contributions to federal

candidates for elected office and whether foreign source funds were used to make

contributions to political organizations in violation of federal law.   In this regard, the

source of funds used by DAVID CHANG, AUDREY YU, and their related companies, to

make substantial donations to political organizations and candidates for federal office

was material to the Grand Jury's investigation. The relationships, if any, between Nikko,

Bright & Bright, Panacom, Hudson, and DAVID CHANG; and the location, past

disposition, alteration, and destruction of Nikko, Bright & Bright, Panacom, and Hudson

documents were also material to the Grand Jury's investigation.

21.   On or before June 4, 1999, the Government notified one of DAVID CHANG's former

attorneys that the Grand Jury would subpoena the former attorney for testimony and

documents relating to the circumstances under which documents were produced to the

prior grand juries in response to the First, Second, and Third Grand Jury Subpoenas. The

former attorney's production of Bright & Bright check numbered 3945 was of particular

concern.

22.   On or about June 11, 1999, The Grand Jury issued subpoenas to the attorneys who formerly represented DAVID CHANG, Nikko, and Bright & Bright with respect to the First, Second, and Third Grand Jury Subpoenas, which subpoenas required the former attorneys' appearance before the Grand Jury and the production of "Any and all non-privileged original records and/or documents relating or incident to Bright & Bright check no. 3945."

23.   After July 6, 1999, litigation was pending in the United States District Court for the District of New Jersey ("U.S. District Court"), seeking to prevent the testimony of and production of records by former attorneys for DAVID CHANG, Nikko, and Bright & Bright who had produced records to the prior grand juries in response to the First, Second, and Third Grand Jury Subpoenas based on the assertion of the attorney-client privilege (hereinafter the "Privilege Litigation"). A controverted issue in the Privilege Litigation was whether DAVID CHANG had standing to assert the attorney-client privilege on behalf of Nikko and Bright & Bright. The identity of the shareholders of Nikko and Bright & Bright was a material fact in determining the standing issue.

24.   On or about August 6, 1999, the Grand Jury issued its subpoena to the Chairman, individually and as custodian of records for Nikko and Bright & Bright (hereinafter the "Fourth Grand Jury Subpoena"). The Fourth Grand Jury Subpoena required the Chairman's testimony before the grand jury and the production of certain documents described in an attachment as follows:

Documents to be Produced:

Any and all documents within your possession and control relating or incident to:

1)   Any and all documents and records relating to the:

  - ownership and/or management of Bright & Bright Corporation
  - ownership and/or management of Nikko Enterprises
  - identities of all shareholders of Bright and Bright Corporation
  - identities of all shareholder of Nikko Enterprises.

  Such documents shall include, but are not limited to:

  - public and non public filings setting out management and ownership
  - list(s) of shareholders
  - stock certificates
  - stock registers
  - dividends and/or any form of compensation paid to shareholders
  - compensation of any form paid to management
  - Forms W-2 and 1099 for dividends paid to shareholders and officers and directors.

2)   For the period of 1995 to the present, documents and records of Bright and Bright Corp. and Nikko Enterprises, not already produced to the federal grand jury in Newark, identified as follows:

  - documents and records reflecting capitalization
  - original general ledger
  - original cash journals
  - original complete check register(s)
  - listing of all bank accounts
  - documentation of any loans to or from Bright and Bright and Nikko Enterprises
  - loans to officers and/or directors and/or management and/or related persons and entities
  - any listings of the countries in which Bright & Bright and Nikko Enterprises are licensed to an/or have done business in
  - completed and draft federal corporate tax returns and all other federal, state, and local tax filings.

Said records set out above shall include all records of all entities, whether foreign or domestic, related to Bright and Bright and Nikko enterprises,

including without limitation parent companies, subsidiaries, and holding companies.

25.     The attachment to the Fourth Grand Jury subpoena further defined the terms used in its

description of documents to be produced as follows:

Definitions:

Unless explicitly stated otherwise, the following words or phrases used herein shall be construed as follows:

(1)  "Document" or "records" refers to all written or graphic matter, however produced or reproduced, or to any other tangible permanent record, and, without limitation, including, among other things, all letters, correspondence, records, memoranda, minutes, notes, summaries, telephone records, books, schedules, reports, studies, appraisals, analyses, lists, interviews, books of account, telegrams, notes and minutes of meetings, interoffice communications, results of investigations, working papers, computer data, papers similar to any of the foregoing and other writings of every kind of description (whether or not actually used, and including drafts of all documents), and including not only originals of such documents but all photostatic or microfilmed copies in whatever form, and all sound records or electronic data compilations in whatever form.

(2)  A document "relating or incident to" a given subject matter means any document or communication that constitutes, contains, embodies, comprises, reflects, identifies, describes, analyzes, or is in any way pertinent to that subject, including, without limitation, documents concerning the presentation of other documents.

(3)  A document within your "possession and control" includes not only those in your direct possession, but also those documents in the possession of another person which you have the right to claim or possess.

(4)  "Document(s)" also includes all items which are subject to a claim of privilege.  If any such documents are responsive to the subpoena, each page of the "privileged" document will be numbered consecutively, and placed in a sealed envelope to be held by the custodian until directed otherwise by the Court.  The custodian will then provide the Grand Jury with a log which includes the following information with respective to each document withheld: the page numbers assigned, the

-10-

date, its author, primary and secondary addresses, the type of document (e.g. , letter, memo, report), the client, the attorney, a general description of the subject matter of the document, and which privilege which is claimed.

26. On or about September 21, 1999, the Grand Jury's Subpoena for the personal appearance of AUDREY YU was served on AUDREY YU, requiring her appearance before the Grand Jury on September 24, 1999.

27. The Grand Jury also issued a subpoena to a person known to it (hereinafter referred to as "The Grand Jury Witness") who was identified by AUDREY YU as a shareholder of Panacom who had lent and invested approximately $1 million to capitalize Panacom. The subpoena was served on The Grand Jury Witness on November 17, 1999, and required her personal appearance before the Grand Jury.

28. On or about March 13, 2000, a person known to the grand jury who had been employed by Panacom (hereinafter the "Panacom Witness") was served with a grand jury subpoena that required him to appear before the Grand Jury on March 17, 2000, and to produce documents relating or incident to "David Chang, Bright & Bright, Nikko Enterprises, Panacom, Hudson Terrace Realty Management, Audrey Yu," and two other individuals. The date for the personal appearance of the Panacom Witness was later postponed.

29. On or about March 16, 2000, attorneys representing DAVID CHANG appeared in the Federal District Court for the District of New Jersey seeking, in part, to bar a former attorney of DAVID CHANG's from producing records to the Grand Jury relating to the incorporation of a foreign corporation and the opening of a foreign bank account in the name of said foreign corporation. A federal district judge denied DAVID CHANG's

motion and provided records concerning the foreign corporation to government agents.

DAVID CHANG knew that the Panacom Witness was present in the foreign country with

DAVID CHANG's former attorney when the foreign bank account was opened in the

name of the foreign corporation.   The possible existence and location of foreign accounts

controlled by or accessible by DAVID CHANG was material to the Grand Jury's

investigation.

## COUNT ONE
(Causing False Statements to a Federal Agency)

30.     Paragraphs 1 through 2, 7, and 8 through 15 of the Introduction to this Second

Superseding Indictment are incorporated and realleged by reference herein.

31.     Between on or about December 7, 1995  and January 30, 1996,  in the District of New

Jersey and elsewhere, in a matter within the jurisdiction of the FEC, an agency of the

United States, Defendant,

### DAVID CHANG,

did knowingly and willfully cause the Treasurer of the Torricelli Campaign to make and

use a material false writing and document by filing a Report of Receipts and

Disbursements, FEC Form-3, with the Secretary of the United States Senate, for

transmittal to the FEC , knowing the same to be false.

32.     On or about January 30, 1996, the Treasurer for the Torricelli Campaign signed a Report

of Receipts and Disbursements (hereinafter the "1995 Year-End Report") on behalf of the

Torricelli Campaign in which she certified that the information contained in the 1995

Year-End Report was correct and complete as of December 31, 1995, when the 1995

Year-End Report was false in the following material respects:

a.       Schedule A listed the names of individuals who wrote checks solicited and

reimbursed by DAVID CHANG and Bright & Bright as the names of contributors

to the Torricelli Campaign, when in fact DAVID CHANG then well knew that

the true contributor of these funds was DAVID CHANG and Bright & Bright.

b.       Schedule A listed the amount stated on the individual checks solicited and

reimbursed by DAVID CHANG and Bright & Bright as the total amount of those

individuals' contributions to the Torricelli Campaign, when in fact DAVID

CHANG then well knew that the total amount of those contributions should have

been attributed to DAVID CHANG and Bright & Bright.

33.     DAVID CHANG then well knew that the Report by the Treasurer would be false in

material respects when submitted to the FEC because of the following:

a.       On or about December 8, 1995, DAVID CHANG solicited personal checks from

Bright & Bright employees known to the Grand Jury, in the amount of $2,000 for

each employee and another $2,000 each for the spouses of those employees who

were married, payable to the Torricelli Campaign for the primary and general

elections, which DAVID CHANG and Bright & Bright caused to be reimbursed

with checks in like amounts drawn on a Bright & Bright account in the total

amount of approximately $8,000.

b.       On or about December 8, 1995, DAVID CHANG solicited two personal checks

from an individual known to the Grand Jury who was a contractor that DAVID

-13-

CHANG had done business with through Bright & Bright, in the amount of

$1,000 each, for a total of $2,000, payable to the Torricelli Campaign for the

primary and general elections, which checks DAVID CHANG and Bright &

Bright caused to be reimbursed with checks in like amount drawn on a Bright &

Bright account.

c.     On or about December 13, 1995, DAVID CHANG caused the aforementioned

checks, along with others, in the total amount of $21,000, to be delivered to the

Torricelli Campaign and credited to his fund-raising efforts.

All in violation of Title 18 United States Code Sections 2 and 1001.

## COUNT TWO

(Conspiracy To Violate 18 U.S.C. § 1001 and
to Impair and Impede an Agency of the United States )

34.    Paragraphs 1 through 15 of the Introduction and paragraphs 31 through 33 of Count One

of this Second Superseding Indictment are incorporated and realleged by reference

herein.

35.    Beginning on or about September 1, 1995, and continuing thereafter to on or about

January 31, 1997, within the District of New Jersey and elsewhere, Defendant,

**DAVID CHANG,**

unindicted co-conspirators Berek Don, Carmine Alampi, and other unindicted co-

conspirators, did knowingly and willfully combine, conspire, confederate, and agree with

and among each other, and with persons both known and unknown to the Grand Jury, as

follows:

-14-

a.   in a matter within the jurisdiction of the FEC, an agency of the United States, to cause the Treasurer of the Torricelli Campaign to make and use a material false writing and document, by presenting to the Secretary of the United States Senate and the FEC, a federal election campaign report on behalf of the Torricelli Campaign, knowing the same to be false in that said report listed certain individuals as having made contributions of their own funds to the Torricelli Campaign, or having paid expenses on behalf of the Torricelli Campaign, when, in fact said funds and expenses were contributed by DAVID CHANG and Bright & Bright; and

b.   to defraud the United States by impairing, impeding, obstructing and defeating the lawful functions and duties of the FEC.

### MANNER AND MEANS

DAVID CHANG and the unindicted co-conspirators and others carried out the conspiracy in the following manner and by the following means:

36.   Between on or about September 12, 1995, and January 23, 1996, DAVID CHANG agreed to serve on the Torricelli Campaign Finance Committee and committed that he would raise funds and sponsor events to raise funds for the Torricelli Campaign.

37   In and around 1996, the exact date being unknown to the Grand Jury, DAVID CHANG committed to the Torricelli Campaign that he would sponsor a fund-raising event and would raise a certain amount of funds to be contributed to the Torricelli Campaign.

38.   As the date for the fund-raising event approached, DAVID CHANG had not received a sufficient number of contributions to meet the amount he had agreed to raise.  DAVID

-15-

CHANG, therefore, asked Berek Don to solicit personal checks payable to the Torricelli

Campaign, which he would reimburse.

39.     Berek Don understood that DAVID CHANG wanted personal checks payable to the

Torricelli Campaign in amounts of $1,000 each for individuals, or $2,000 for married

individuals, totaling $11,000, which was the amount that DAVID CHANG still needed in

order to meet the total contribution amount he had promised to the Torricelli Campaign.

DAVID CHANG agreed to reimburse individuals solicited by Berek Don and others with

Bright & Bright's funds.

40.     Berek Don, a Bergen County Republican Party official, did not want to be seen raising

money for the Democratic Party's candidate for the United State Senate, so Berek Don

asked Carmine Alampi to help him and DAVID CHANG solicit conduits to write

personal checks payable to the Torricelli Campaign.  Carmine Alampi agreed to help

Berek Don and DAVID CHANG raise additional conduit contributions for the Torricelli

Campaign.

41.     Berek Don and Carmine Alampi solicited employees, clients, and other persons

associated with the Don/Alampi Law Firm to write personal checks payable to the

Torricelli Campaign, which would be reimbursed with funds received by Berek Don from

DAVID CHANG.

42.     Berek Don delivered the reimbursed contributions gathered by himself and Carmine

Alampi to DAVID CHANG in the form of either personal checks in the amount of $1,000

signed by individuals, or personal checks in the amount of $2,000 signed by individuals

and their spouses.  The conspirators knew that the Torricelli Campaign would

-16-

report the contributions to the FEC in the names of the individuals and their spouses listed on the personal checks, rather than in the name of DAVID CHANG or Bright & Bright.

43. At all times during the conspiracy, DAVID CHANG and his co-conspirators knew that federal law prohibited corporations from making contributions to a candidate running for election to a federal office and for any individual to make contributions in the name of another individual. The conspirators also knew that the Treasurer of the Torricelli Campaign was required to accurately and completely report the names of its contributors to the FEC. DAVID CHANG was notified by the Torricelli Campaign of upcoming FEC reporting dates and urged to raise more funds for the Torricelli Campaign. The Torricelli Campaign told DAVID CHANG, Carmine Alampi, and others on the Torricelli Campaign Finance Committee that the funds they raised for the Torricelli Campaign would be credited to them.

44. DAVID CHANG and his co-conspirators, knowing of the Torricelli Campaign's obligation to periodically report a list of its contributors and contributions to the FEC, caused the contributions made by DAVID CHANG and Bright & Bright to be falsely reported in the names of other individuals and in amounts which would comply with federal campaign financing limits, in order to prevent the FEC from publishing the true amount of DAVID CHANG's and Bright & Bright's contributions to the Torricelli Campaign and from disqualifying the illegal contributions made by DAVID CHANG and Bright & Bright, thereby impairing and impeding the FEC in its lawful functions.

-17-

## OVERT ACTS

In furtherance of this conspiracy and to effect the objects thereof, there was committed by at least one of the co-conspirators herein, in the District of New Jersey and elsewhere, at least one of the following overt acts, among others:

45.   On or about July 18, 1996, DAVID CHANG  provided to Berek Don, a check drawn on Bright & Bright's corporate banking account, payable to the Don/Alampi Law Firm in the amount of $11,000, whose proceeds were to be used to reimburse individual checks payable to the Torricelli Campaign.

46.   On or about July 19, 1996, Berek Don asked a friend who owned a store to cash the Bright & Bright check so that he could use currency to reimburse the individuals from whom he solicited personal checks payable to the Torricelli Campaign.

47.   Between on or about July 7, 1996, and on or about July 17, 1996, Berek Don solicited personal checks from three individuals, totaling $5,000,  which he reimbursed with funds he received from the Bright & Bright check.

48.   On or about July 19, 1996, Berek Don provided Carmine Alampi with some of the cash he received from the Bright & Bright check.

49.   On or about July 22, 1996, Carmine Alampi issued a check from his personal account in the amount of $1,000 payable to the Torricelli Campaign which was reimbursed with funds Berek Don received from the Bright & Bright check.

50.   On or about July 22, 1996, Carmine Alampi solicited a personal check from an employee of the Don/Alampi Law Firm in the amount of $1,000 payable to the Torricelli Campaign, which he reimbursed with his personal check.

-18-

51.   Between on or about July 17, 1996, and July 19, 1996, Berek Don and Carmine Alampi solicited two personal checks, in the amount of $2,000 each, for a total of $4,000, from two clients of the Don/Alampi Law Firm and their spouses, payable to the Torricelli Campaign, which checks were reimbursed with funds Berek Don received from the Bright & Bright check.

52.   On or about July 26, 1996, DAVID CHANG caused the checks solicited by Berek Don and Carmine Alampi to be delivered to the Torricelli Campaign and credited to his fund-raising efforts. These checks were deposited by the Torricelli Campaign into its checking account at the Bridge View Bank in Englewood Cliffs, New Jersey.

53.   In and around September and October 1996, DAVID CHANG caused Bright & Bright to pay travel expenses on behalf of the Torricelli Campaign, which travel expenses the Torricelli Campaign was required to report as "in-kind" contributions or reimburse with campaign funds. Because corporations were not permitted to make "in-kind" contributions to the Torricelli Campaign, DAVID CHANG directed that the "in-kind" contributions by Bright & Bright be reported to the Torricelli Campaign in the names of two Bright & Bright employees known to the Grand Jury as travel expenses totaling approximately $1,700.

54.   On or about October 16, 1996, the Treasurer of the Torricelli Campaign signed a Report of Receipts and Disbursements (hereinafter the "1996 Third-Quarter Report") on behalf of the Torricelli Campaign in which she certified that the information contained in the 1996 Third-Quarter Report was correct and complete as of September 30, 1996. Said

-19-

1996 Third-Quarter Report was thereafter submitted to the Secretary of the United States Senate and the FEC and was false in the following material respects:

a.     Schedule A listed the names of individuals who wrote checks solicited and reimbursed by the conspirators as the names of contributors to the Torricelli Campaign, when in fact the conspirators then well knew that the true contributors of these contributions were DAVID CHANG and Bright & Bright.

b.     Schedule A listed the amount stated on the checks given by individuals solicited and reimbursed by the conspirators as the total amount of those individuals' contributions to the Torricelli Campaign, when in fact the conspirators then well knew that the total amount of those contributions should have been attributed on the 1996 Third-Quarter Report to DAVID CHANG and Bright & Bright.

c.     Schedules A and B listed the names of certain individuals who made in-kind contributions to the Torricelli Campaign, when in fact DAVID CHANG then well knew that the true contributor of these in-kind contributions was Bright & Bright.

All in violation of Title 18, United States Code Section 371.

## COUNT THREE
(Causing False Statements to a Federal Agency)

55.     Paragraphs 1 through 15 of the Introduction and paragraphs 36 through 54 of Count Two of this Second Superseding Indictment are incorporated and realleged by reference herein.

56.     Between on or about July 18, 1996, and October 14, 1996,  in the District of New Jersey

and elsewhere, in a matter within the jurisdiction of the FEC, an agency of the United

States, Defendant,

### DAVID CHANG,

aided and abetted by others known and unknown to the Grand Jury, did knowingly and

willfully cause the Treasurer of the Torricelli Campaign to make and use a material false

writing and document by filing 1996 Third-Quarter Report, with the Secretary of the

United States Senate, for transmittal to the FEC, knowing the same to be false; in that the

1996 Third-Quarter Report listed certain individuals as having made contributions of

their own funds to the Torricelli Campaign, and as having paid certain expenses on

behalf of the Torricelli Campaign, in certain amounts, when, in fact he then well knew

that said funds and expenses were contributed by himself and Bright & Bright.

All in violation of Title 18 United States Code Sections 2 and 1001.


## COUNT FOUR
(Conspiracy to Violate 18 U.S.C. §§ 1503, 1512, 1622, & 1623)

57.     Paragraphs 1 through 29 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

58.     From on or about July 19, 1996, and continuing through on or about March 27, 2000,  in

Bergen County, in the District of New Jersey and elsewhere, Defendants

**AUDREY YU and<br>DAVID CHANG,**

did knowingly and willfully combine, conspire, confederate, and agree with and among

each other and with persons both known and unknown to the Grand Jury:

a.      to corruptly endeavor to influence, obstruct, and impede the due administration of

justice in violation of Title 18, United States Code §1503;

b.      to hinder, delay, and prevent the communication to a law enforcement officer of

information relating to the commission of a federal offense, to wit: the

solicitation and reimbursement of conduit contributions to the Torricelli

Campaign, in violation of Title 18, United States Code § 1512(b)(3) ;

c.      to engage in misleading conduct towards another person, with intent to influence

that person's testimony in the Grand Jury, in violation of Title 18, United States

Code § 1512(b)(1);

d.      to engage in misleading conduct towards another person, with intent to cause or

induce that person to withhold a record, document, or other object from the

Grand Jury in violation of Title 18, United States Code § 1512(b)(2)(A);

e.      to corruptly persuade and attempt to corruptly persuade a witness to give false

testimony to the Grand Jury in violation of Title 18, United States Code

§ 1512(b)(1);

-22-

f.     to procure another to commit perjury in violation of Title 18, United States Code § 1622; and

g.     to knowingly and intentionally make, and cause others to make, false material declarations to the Grand Jury, while under oath as a witness before the Grand Jury, in violation of Title 18, United States Code § 1623.

## MANNER AND MEANS

AUDREY YU, DAVID CHANG, unindicted co-conspirators and others carried out the conspiracy in the following manner and by the following means:

59.    AUDREY YU and DAVID CHANG having knowledge of the grand juries' investigations as described in the Introduction to this Second Superseding Indictment and the grand juries' subpoenas for the production of documents related to Bright & Bright check numbered 3945, in the amount of $11,000, would alter the memo portion of the check in an attempt to disguise its true purpose, which was to reimburse individual checks to the Torricelli Campaign, and, thereafter, cause persons acting on their behalf, and on behalf of Nikko and Bright & Bright, to produce the altered check to the grand juries in an attempt to obstruct the grand juries' investigations of the campaign financing conduit scheme.

60.    AUDREY YU and DAVID CHANG, having knowledge of an investigation by federal law enforcement officers, drafted written "certifications" in the names of former Bright & Bright employees and employee spouses, whose federal campaign contributions had been reimbursed, stating in essence that they had not been reimbursed; and thereafter

-23-

asking a former employee to sign such a certification and causing the employee's
spouse's name to be signed to another such certification.

61. DAVID CHANG, having knowledge of an investigation by federal law enforcement
officers, instructed a former Bright & Bright employee that if she were asked by federal
agents if she had made a reimbursed campaign contribution she should say that it was her
own contribution, intending that the former Bright & Bright employee not communicate
to law enforcement officers that she had been reimbursed for her campaign contributions
by DAVID CHANG and AUDREY YU.

62. Beginning in and around June 1999, DAVID CHANG and AUDREY YU, knowing that
the Privilege Litigation was pending in the U.S. District Court caused a false document
purporting to establish DAVID CHANG's sole ownership of Bright & Bright as of
December 31, 1995, to be submitted to the Court and the Government's attorneys.

63. Beginning in and around June 1999, AUDREY YU and DAVID CHANG, having
knowledge of the Grand Jury's investigation and that certain documents relating to the
ownership and financial condition of Nikko, Bright & Bright, Panacom, and other
companies controlled by DAVID CHANG were material to the Grand Jury's
investigation. destroyed documents to prevent their production to the Grand Jury.

64. Beginning in and around June 1999, AUDREY YU and DAVID CHANG, having
knowledge of the Grand Jury's investigation and that documents relating to the
ownership and financial condition of Nikko, Bright & Bright, Panacom, and other
companies controlled by DAVID CHANG were material to the Grand Jury's

-24-

investigation, attempted to delete documents from computers at 464 Hudson Terrace to prevent their production to the Grand Jury.

65.   Beginning in and around August 1999,  AUDREY YU and DAVID CHANG, having knowledge of the Grand Jury's investigation and the Fourth Grand Jury Subpoena caused persons acting on their behalf, and on behalf of Nikko and Bright & Bright to make an incomplete production of records and withhold the production of responsive documents.

66.   Beginning in and around August 1999, AUDREY YU and DAVID CHANG, having knowledge of the Grand Jury's investigation and the Fourth Grand Jury Subpoena destroyed documents responsive to the Grand Jury's subpoena in order to prevent their production to the Grand Jury.

67.   Beginning in and around August 1999, AUDREY YU and DAVID CHANG, having knowledge of the Grand Jury's investigation and the Fourth Grand Jury Subpoena attempted to delete documents stored on computers which were responsive to the Grand Jury's subpoena in order to prevent their production to the Grand Jury.

68.   Beginning in and around August 1999, AUDREY YU and DAVID CHANG, having knowledge of the Grand Jury's investigation and the Fourth Grand Jury Subpoena provided incomplete and misleading information to the Chairman and attorneys acting on behalf of the Chairman, Nikko, and Bright & Bright in order to impede the Grand Jury's investigation.

69.   Beginning in and around August 1999, AUDREY YU and DAVID CHANG, having knowledge of the Grand Jury's investigation, misrepresented their ownership, position,

-25-

and control of Nikko, Bright & Bright, and Panacom in order to impede the Grand Jury's investigation.

70.　In and around September 1999, AUDREY YU, while under oath as a witness before the Grand Jury, knowingly and intentionally made false material declarations to the Grand Jury.

71.　Beginning in and around November 1999, DAVID CHANG, knowing that AUDREY YU had made false material declarations to the Grand Jury, and that The Grand Jury Witness had been subpoenaed to testify before the Grand Jury, would suggest a false story to The Grand Jury Witness that would appear to corroborate the false declarations that AUDREY YU had previously made to the Grand Jury, with the intent to influence The Grand Jury Witness' testimony.

72.　In and around March 2000, DAVID CHANG, knowing that the issue of foreign bank accounts had been raised before the Grand Jury and the U.S. District Court, and that the Court had required his former attorney to release documents relating to a certain foreign bank account, contacted the Panacom Witness and attempted to persuade him to omit material information in his testimony before the Grand Jury and to falsely testify to the Grand Jury that a check DAVID CHANG had given to the Panacom Witness was a loan, when DAVID CHANG then well knew that the check was given to the Panacom Witness in exchange for the deposit of an equivalent amount of South Korean funds into a South Korean bank account as directed by DAVID CHANG and was not a loan.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, there was committed by at least o⸱ e of the co-conspirators herein, in the District of New Jersey and elsewhere, at least one of the following overt acts, among others:

73.    Between on or about July 19, 1996 and April 4, 1997, AUDREY YU and DAVID CHANG caused the memo portion of Bright & Bright Check numbered 3945, which contained the words "legal fees," to be altered to contain the words "Cash Settlement for Mr. Park."

74.    In and around August 1996, AUDREY YU and DAVID CHANG drafted a "certification" which falsely stated that a certain Bright & Bright employee's contribution to the Torricelli Campaign was made in the employee's "individual capacity," which certification DAVID CHANG directed the employee to sign, when AUDREY YU and DAVID CHANG then well knew that the employee's check and his wife's check had been solicited by DAVID CHANG and reimbursed with Bright & Bright's funds.

75.    Between on or about March 13, 1997, and on or about April 4, 1997, AUDREY YU and DAVID CHANG collected documents, and caused documents to be collected, which were responsive to the Second Grand Jury Subpoena. Bright & Bright check numbered 3945, in the amount of $11,000, payable to the Don/Alampi Law Firm, was among the documents collected by AUDREY YU and DAVID CHANG which were responsive to the Second Grand Jury Subpoena.

76.    On or about April 4, 1997, DAVID CHANG authorized an attorney representing himself and Bright & Bright to submit a copy of the altered Bright & Bright check numbered 3945 to the U.S. Attorney's Office and the grand jury.

77.    On or about June 25, 1998, DAVID CHANG authorized a law firm representing himself and Bright & Bright to produce to the U.S. Attorney's Office, for delivery to the grand jury, original checks responsive to the Third Grand Jury subpoena, including the altered original Bright & Bright check numbered 3945.

78.    On or about August 13, 1998, AUDREY YU called a former Bright & Bright employee at her home and asked her to come to Bright & Bright's offices where DAVID CHANG directed the former employee to sign a "certification" which falsely stated that the Bright & Bright employee's contribution to the Torricelli Campaign was made in the employee's "individual capacity," when AUDREY YU and DAVID CHANG then well knew that the former employee's check had been solicited by DAVID CHANG and reimbursed with Bright & Bright's funds.

79.    In and around August, 1998, AUDREY YU and DAVID CHANG drafted a "certification" in the name of a former Bright & Bright employee's spouse, causing the forged signature of the employee's spouse to be affixed thereto, which "certification" falsely stated that the Bright & Bright employee's spouse's contribution to the Torricelli Campaign was made with "personal funds" and that the employee's spouse "did not expect any reimbursement form (sic) the Company," when AUDREY YU and DAVID CHANG then well knew that the former employee's check had been solicited by DAVID CHANG and reimbursed with Bright & Bright's funds.

-28-

80.   On or about August 3, 1999, AUDREY YU created a document on her computer located at 464 Hudson Terrace, back-dated to December 31, 1995, which document purported to establish DAVID CHANG as the sole shareholder of Bright & Bright as of December 31, 1995, an issue material to the Court's ruling on who had standing to assert the attorney-client privilege on behalf of Bright & Bright.

81.   On or about August 24, 1999, DAVID CHANG caused his lawyers to deliver the back-dated corporate resolution document created by AUDREY YU to the Court and attorneys representing the United States. AUDREY YU signed this copy of the Bright & Bright resolution dated December 31, 1995.

82.   On or about September 20, 1999, AUDREY YU attempted to delete from her computer the false document which she had created regarding DAVID CHANG's ownership of Bright & Bright.

83.   Between on or about June 10, 1999, and on or about October 1, 1999, at or near 464 Hudson Terrace, Englewood Cliffs, Bergen County, New Jersey, in the District of New Jersey, AUDREY YU attempted to delete documents from computers located at 464 Hudson Terrace to prevent their production to the Grand Jury.

84.   Between on or about June 28, 1999, and on or about October 1, 1999, at or near 464 Hudson Terrace, Englewood Cliffs, Bergen County, New Jersey, in the District of New Jersey, AUDREY YU and DAVID CHANG attempted to destroy documents which were material to the Grand Jury's investigation as described in the Introduction to this Second Superseding Indictment by causing them to be torn, shredded, and deposited in a trash bin to prevent their production to the Grand Jury.

85. Between on or about August 13, 1999, and on or about September 23, 1999, DAVID CHANG spoke with the Chairman concerning the Fourth Grand Jury Subpoena and the Chairman's production of Nikko and Bright & Bright documents to the Grand Jury.

86. Between on or about September 17, 1999, and on or about September 20, 1999, at or near 464 Hudson Terrace, Englewood Cliffs, Bergen County, New Jersey, in the District of New Jersey, AUDREY YU and DAVID CHANG, having knowledge of the Fourth Grand Jury Subpoena attempted to destroy documents responsive to the Fourth Grand Jury's Subpoena and the First, Second, and Third Grand Jury Subpoenas by causing them to be torn, shredded, and deposited in a trash bin.

87. Between on or about September 17, 1999, and on or about September 20, 1999, at or near 464 Hudson Terrace, Englewood Cliffs, Bergen County, New Jersey, in the District of New Jersey, AUDREY YU and DAVID CHANG, knowing that the Chairman was to testify before the Grand Jury on September 24, 1999, concerning the production of documents responsive to the Fourth Grand Jury Subpoena, which included documents stored on computers, attempted to destroy and conceal documents responsive to the Fourth Grand Jury Subpoena and the First , Second, and Third Grand Jury Subpoenas by causing said documents to be deleted from the computers located at 464 Hudson Terrace.

88. On or about September 23, 1999, at or near 464 Hudson Terrace, Englewood Cliffs, Bergen County, New Jersey, in the District of New Jersey, DAVID CHANG met with the Chairman and discussed the Fourth Grand Jury Subpoena.

89. On or about September 23, 1999, at or near 464 Hudson Terrace, Englewood Cliffs, Bergen County, New Jersey, in the District of New Jersey, DAVID CHANG, knowing

that the Chairman was to testify before the Grand Jury on September 24, 1999,

concerning the production of documents responsive to the Fourth Grand Jury Subpoena,

intentionally gave the Chairman false information concerning the existence, and location

of documents responsive to the Fourth Grand Jury Subpoena, and the prior production of

documents responsive to the First, Second, and Third Grand Jury Subpoenas, some of

which documents he then knew had not been produced and had been torn, shredded, and

deposited in a trash bin and deleted from the computers at 464 Hudson Terrace.

90.   On or about September 23, 1999, at or near 464 Hudson Terrace, Englewood Cliffs,

Bergen County, New Jersey, in the District of New Jersey, DAVID CHANG, knowing

that the Chairman was to testify before the Grand Jury on September 24, 1999,

concerning the production of documents responsive to the Fourth Grand Jury Subpoena,

intentionally withheld from the Chairman certain documents responsive to the Fourth

Grand Jury Subpoena, some of which were stored in the Bright & Bright and Hudson

offices located at 464 Hudson Terrace, Englewood Cliffs, New Jersey.

91.   On or about September 24, 1999, at or near Newark, New Jersey, DAVID CHANG

caused lawyers representing him and Bright & Bright to deliver to agents of the Grand

Jury documents that he knew were an incomplete response to the Fourth Grand Jury

Subpoena.

92.   On or about September 24, 1999, at or near Newark, New Jersey, DAVID CHANG

caused the Chairman, while under oath as a witness before the Grand Jury, to give false

and misleading testimony concerning the existence, location, and disposition of Nikko,

-31-

Bright & Bright, and Panacom documents and to withhold Nikko and Bright & Bright documents from the Grand Jury.

93. On or about September 24, 1999, in Newark, New Jersey, in the District of New Jersey, AUDREY YU, while under oath as a witness before the Grand Jury in Newark, did knowingly and intentionally make false material declarations to the Grand Jury, which are underlined below, concerning the following subject matter, in response to the following questions:

a.  With respect to the location, existence, and possible destruction and shredding of Bright & Bright documents, which information was material to the Grand Jury's investigation, AUDREY YU testified as follows:

| Question: | The question was, in the last ten years, are you aware of any Bright & Bright documents that were less than three years old being destroyed by any means, including being burned or shredded, that were not documents that had been mistyped? |
|---|---|
| Answer: | I don't recall. |
| Question: | Okay. Is it possible that that happened? |
| Answer: | I don't recall any specific instance. |
|  | ***** |
| Question: | In the last month, did David Chang or anyone ever ask you, or were you ever aware of Bright & Bright documents being destroyed by any means? |
| Answer: | I don't recall. |

-32-

b.    With respect to the opportunity of AUDREY YU to witness the shredding of

documents which may have been at Hudson's offices at 464 Hudson Terrace, as

well as the location and existence of such documents, which information was

material to the Grand Jury's investigation, AUDREY YU testified as follows:

| | |
|---|---|
| Question: | Ms. Yu, in the last year, within the offices of Hudson Terrace Management Corporation that you've identified by this map that is AY-2, at any time have you seen documents that appear to have been destroyed by any means, including by being burned or shredded? |
| Answer: | I don't--I don't remember that. |

c.    With respect to AUDREY YU's whereabouts, and the opportunity of AUDREY

YU to witness events which may have taken place at Hudson's offices at

464 Hudson Terrace, which information was material to the Grand Jury's

investigation, AUDREY YU testified as follows:

| | |
|---|---|
| Question: | And when's the last time that you were there? |
| Answer: | When? |
| Question: | Yeah. |
| Answer: | A few weeks ago. |
| Question: | A few weeks ago. So you would have been there--you would not have been there this past week. Is that correct? That is to say, you were not there on September 20th through September 25th. Is that right? |
| Answer: | 20th? I think so, yeah. |

-33-

Question:        You were there?

Answer:          <u>No, I was not there</u>.

Question:        So, the question is, you were never at the
                 offices at Hudson Terrace or anywhere else
                 in that building for this whole week, that is,
                 September 20th through the 25th, you never
                 went there, did you?

Answer:          <u>I don't remember</u>.

                            ******

Question:        Okay.  And the question was, speaking of
                 this week, that is, September 20th through
                 25th, have you ever been at the offices of
                 Hudson Management Corporation or
                 anywhere else in that building this week?

Answer:          <u>I'm not sure</u>.

Question:        You're not sure?

Answer:          <u>Yes</u>.

Question:        Okay.  Well, Ms. Yu, I mean we're only
                 talking about a couple days ago.  You don't
                 remember if you were at the office or not?

Answer:          <u>I'm not sure.</u>  I don't go there often, so I'm
                 not sure whether I was there, when I was
                 there.

Question:        Ma'am, were you there--have you been there
                 today?

Answer:          Where?  No.

Question:        Were you there yesterday?

Answer:          No.

                             -34-

| | |
|---|---|
| Question: | Were you there the day before yesterday? |
| Answer: | No. |
| Question: | Were you there on Monday? |
| Answer: | Monday?  I don't think so. |
| Question: | Were you there on Tuesday? |
| Answer: | I don't think so. |
| Question: | Okay.  And I believe I already asked you this, but you weren't there Wednesday? |
| Answer: | Wednesday, no, I wasn't there. |
| Question: | You weren't there Thursday, yesterday. |
| Answer: | No. |
| Question: | And you haven't been there today, have you? |
| Answer: | No. |
| Question: | So the answer to my question is, have you been there this week, no? |
| Answer: | Maybe no then. |
| Question: | Well, I am not looking for maybes.  Were you there or were you not there? |
| Answer: | I don't remember I was there this week. |
| Question: | You don't remember being there this week? |
| Answer: | Right. |

d.    With respect to the location and existence of Bright & Bright documents, which

information was material to the Grand Jury's investigation, AUDREY YU

testified as follows:

| | |
|---|---|
| Question: | At the Hudson Management Corporation offices in the last year-- |
| Answer: | Yes. |
| Question: | --have you seen any Bright and Bright documents? |
| Answer: | I see stationery. |
| Question: | Okay. |
| Answer: | Yes. |
| Question: | Anything else besides stationery? |
| Answer: | I don't remember.  I don't think I see anything else. |
| Question: | Okay.  But you could have, you don't know, or what? |
| Answer: | I don't remember. |

e.    With respect to whether the business of Panacom was being conducted at

Hudson's offices, which information was material to the Grand Jury's

investigation, AUDREY YU testified as follows:

| | |
|---|---|
| Question: | Are you aware of any of the business of Panacom being conducted at the offices of the Hudson Realty Management? |
| Answer: | No. |

f.   With respect to who owned the shares of Panacom, which information was

material to the Grand Jury's investigation, AUDREY YU testified as follows:

| | |
|---|---|
| Question: | Are you the sole shareholder of Panacom? |
| Answer: | No. |
| Question: | Okay.  Do you own shares yourself? |
| Answer: | I own shares?  Is that your question? |
| Question: | Yes. |
| Answer: | Yes. |
| Question: | How many shares do you own? |
| Answer: | I own --- I own fifty percent. |
| Question: | Fifty percent? |
| Answer: | Uh-hum. |
| Question: | And who owns the rest of the shares of that corporation? |
| Answer: | Who owns the other -- no, it was forty percent, forty percent by [the Grand Jury Witness]. |

g.   With respect to who loaned money to capitalize Panacom, which information was

material to the Grand Jury's investigation, AUDREY YU testified as follows:

| | |
|---|---|
| Question: | Ms. Yu, when we left, the last question was, how much money did [The Grand Jury Witness] contribute to the corporation. And you had also had the chance to consult with your attorney at lunch? |
| Answer: | Yes. |
| Question: | Okay.  What's the answer to that question? |

-37-

| Answer: | She lended (sic) five hundred fifty thousand. |
|---|---|
| Question: | Five hundred and fifty thousand. |
| Answer: | Uh-hum. |
| Question: | Okay. And who else has contributed money to the corporation. |
| Answer: | She lended (sic) money to me, five hundred fifty thousand. |
| Question: | To you or the corporation? |
| Answer: | To me. |
| Question: | To you? |
| Answer: | Yes. |
| Question: | Okay. |
| Answer: | And then four hundred fifty thousand she [the Grand Jury Witness] invested. |
| Question: | Okay. So when you say this was your company, was the only money that you put in the five hundred and fifty thousand that you had gotten from [the Grand Jury Witness]? |
| Answer: | Yes. |
| Question: | Okay. Well, do you know why -- let me ask, first of all, who is [the Grand Jury Witness]. |
| Answer: | She's my friend. |

94.    Between on or about September 24, 1999, and on or about November 17, 1999,

AUDREY YU told DAVID CHANG about the testimony she had given to the Grand Jury

on September 24, 1999.

-38-

95.     On or about November 17, 1999, at or near 210 Hillside Avenue, Cresskill, Bergen

County, New Jersey, in the District of New Jersey, DAVID CHANG approached the

Grand Jury Witness, knowing that she had been subpoenaed to testify before the Grand

Jury, instructed The Grand Jury Witness to testify falsely to wit: that she had lent

AUDREY YU $550,000 to invest in Panacom and that she had invested $450,000 of her

own money in Panacom; which statements DAVID CHANG then knew were false,

intending that the Grand Jury Witness would repeat the false information to the Grand

Jury.

96.     On or about March 27, 2000, in the District of New Jersey, DAVID CHANG called the

Panacom Witness and arranged to meet him at a restaurant in Englewood Cliffs, New

Jersey where DAVID CHANG told the Panacom Witness that he should avoid testifying

before the Grand Jury and if called to the Grand Jury should falsely testify that a certain

check that DAVID CHANG gave to him in the amount of approximately $80,000 was a

loan, when DAVID CHANG and the Panacom Witness then well knew that the check

was given to the Panacom Witness in exchange for the deposit of an equivalent amount

of South Korean funds in a South Korean account controlled by DAVID CHANG.

All in violation of Title 18, United States Code § 371.


## COUNT FIVE
(Obstruction of the Due Administration of Justice)

97.     Paragraphs 1 through 25 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

-39-

98.     Between on or about the 1st day of June, 1999, and on or about the 24th day of

September, 1999, in Bergen County, in the District of New Jersey, Defendants,

**DAVID CHANG and
AUDREY YU,**

aided and abetted by each other, did corruptly obstruct and impede or endeavor to

influence, obstruct and impede the due administration of justice in a federal grand jury in

the District of New Jersey, by withholding, tearing, shredding, and depositing in a trash

bin, documents; and by attempting to delete computerized records -- all of which were

material to the Grand Jury's investigation into illegal campaign contributions, DAVID

CHANG, Nikko, Bright & Bright, and Panacom.

All in violation of Title 18, United States Code § 1503 and § 2.


## COUNT SIX
(Tampering With a Witness By Misleading Conduct)

99.     Paragraphs 1 through 25 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

100.   On or about the 23rd day of September, 1999, in Bergen County, in the District of New

Jersey, Defendant,

**DAVID CHANG,**

did knowingly engage in misleading conduct toward the Chairman, a grand jury witness,

by communicating false information to the Chairman concerning the location and

disposition of Nikko and Bright & Bright documents with the intent to induce the

Chairman to withhold records, documents and other objects from the Grand Jury.

All in violation of Title 18, United States Code, § 1512(b)(2)(A) and § 2.

## COUNT SEVEN
### (False Declaration Before a Grand Jury)

101.   Paragraphs 1 through 26 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

102.   On or about September 24, 1999, in Newark, New Jersey, within the District of New

Jersey, Defendant,

### AUDREY YU,

while under oath as a witness before the Grand Jury in Newark, did knowingly and

intentionally make false material declarations.

103.   The location, existence, and possible destruction and shredding of Bright & Bright

documents was material to the Grand Jury's investigation.

104.   The opportunity of AUDREY YU to witness the shredding of documents which may

have been present at Hudson's offices at 464 Hudson Terrace was material to the Grand

Jury's investigation.

105.   During AUDREY YU's testimony before the Grand Jury at the time and place alleged in

paragraph 102 above, AUDREY YU drew a diagram of Hudson's offices located at 464

Hudson Terrace (hereinafter "the map" and grand jury exhibit "AY-2").

106.   At the time and place alleged in paragraph 102 above, AUDREY YU, while under oath,

did knowingly declare with respect to the aforesaid material matter, the following:

-41-

| Question: | The question was, in the last ten years, are you aware of any Bright & Bright documents that were less than three years old being destroyed by any means, including being burned or shredded, that were not documents that had been mistyped? |
|---|---|

Answer:      I don't recall.

Question:    Okay. Is it possible that that happened?

Answer:      I don't recall any specific instance.

*****

| Question: | In the last month, did David Chang or anyone ever ask you, or were you ever aware of Bright & Bright documents being destroyed by any means? |
|---|---|

Answer:      I don't recall.

******

| Question: | Ms. Yu, in the last year, within the offices of Hudson Terrace Management Corporation that you've identified by this map that is AY-2, at any time have you seen documents that appear to have been destroyed by any means, including by being burned or shredded? |
|---|---|

Answer:      I don't--I don't remember that.

107.    The aforesaid underlined testimony of AUDREY YU was false, for as she then and there

well knew, Bright & Bright documents had been shredded and destroyed within one

month of her testimony on September 24, 1999; and she had observed the shredding of

documents; and she remembered that this had occurred and she had seen it occur.

All in violation of Title 18, United States Code § 1623.

-42-

## COUNT EIGHT
(False Declaration Before a Grand Jury)

108.   Paragraphs 1 through 26 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

109.   On or about September 24, 1999, in Newark, New Jersey, within the District of New

Jersey, Defendant,

### AUDREY YU,

while under oath as a witness before the Grand Jury in Newark, did knowingly and

intentionally make false material declarations.

110.   AUDREY YU's whereabouts, and the opportunity of AUDREY YU to witness events

which may have taken place at Hudson's offices at 464 Hudson Terrace, was material to

the Grand Jury's investigation.

111.   At the time and place alleged in paragraph 109 above, AUDREY YU, while under oath,

did knowingly declare with respect to the aforesaid material matter, the following:

|  |  |
|---|---|
| Question: | And when's the last time that you were there? |
| Answer: | When? |
| Question: | Yeah. |
| Answer: | A few weeks ago. |
| Question: | A few weeks ago. So you would have been there-- you would not have been there this past week. Is that correct? That is to say, you were not there on September 20th through September 25th. Is that right? |
| Answer: | 20th? I think so, yeah. |

-43-

Question:          You were there?

Answer:            <u>No, I was not there</u>.

Question:          So, the question is, you were never at the offices at
                   Hudson Terrace or anywhere else in that building
                   for this whole week, that is, September 20th through
                   the 25th, you never went there, did you?

Answer:            <u>I don't remember</u>.

                                  ******

Question:          Okay.  And the question was, speaking of
                   this week, that is, September 20th through
                   25th, have you ever been at the offices of
                   Hudson Management Corporation or
                   anywhere else in that building this week?

Answer:            <u>I'm not sure</u>.

Question:          You're not sure?

Answer:            <u>Yes</u>.

Question:          Okay.  Well, Ms. Yu, I mean we're only
                   talking about a couple days ago.  You don't
                   remember if you were at the office or not?

Answer:            <u>I'm not sure</u>.  I don't go there often, so I'm
                   not sure whether I was there, when I was
                   there.

Question:          Ma'am, were you there--have you been there today?

Answer:            Where?  No.

Question:          Were you there yesterday?

Answer:            No.

Question:          Were you there the day before yesterday?

                                   -44-

Answer:          No.

Question:        Were you there on Monday?

Answer:          Monday?  I don't think so.

Question:        Were you there on Tuesday?

Answer:          I don't think so.

Question:        Okay.  And I believe I already asked you
                 this, but you weren't there Wednesday?

Answer:          Wednesday, no, I wasn't there.

Question:        You weren't there Thursday, yesterday.

Answer:          No.

Question:        And you haven't been there today, have you?

Answer:          No.

Question:        So the answer to my question is, have you
                 been there this week, no?

Answer:          Maybe no then.

Question:        Well, I am not looking for maybes.  Were
                 you there or were you not there?

Answer:          I don't remember I was there this week.

Question:        You don't remember being there this week?

Answer:          Right.

112.    The aforesaid underlined testimony of AUDREY YU was false, for as she then and there well knew, on at least one occasion, she was present at Hudson's offices at 464 Hudson Terrace between September 20 and 24, 1999, and remembered being there.

All in violation of Title 18, United States Code § 1623.

## COUNT NINE
(False Declaration Before a Grand Jury)

113.    Paragraphs 1 through 26 of the Introduction and Counts One, Two, and Three of this Second Superseding Indictment are incorporated and realleged by reference herein.

114.    On or about September 24, 1999, in Newark, New Jersey, within the District of New Jersey, Defendant,

**AUDREY YU,**

while under oath as a witness before the Grand Jury in Newark,  did knowingly and intentionally make false material declarations.

115.    The location and existence of Bright & Bright documents were material to the Grand Jury's investigation.

116.    At the time and place alleged in paragraph 114 above, AUDREY YU, while under oath, did knowingly declare with respect to the aforesaid material matter, the following:

| | |
|---|---|
| Question: | At the Hudson Management Corporation offices in the last year-- |
| Answer: | Yes. |
| Question: | --have you seen any Bright and Bright documents? |
| Answer: | I see stationery. |

| | |
|---|---|
| Question: | Okay. |
| Answer: | Yes. |
| Question: | Anything else besides stationery? |
| Answer: | I don't remember.  I don't think I see anything else. |
| Question: | Okay.  But you could have, you don't know, or what? |
| Answer: | I don't remember. |

117.  The aforesaid underlined testimony of AUDREY YU was false, for as she then and there

well knew, she had seen Bright and Bright documents besides stationery at Hudson's

offices at 464 Hudson Terrace, and remembered seeing them.

All in violation of Title 18, United States Code § 1623.


## COUNT TEN
(False Declaration Before a Grand Jury)

118.  Paragraphs 1 through 26 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

119.  On or about September 24, 1999, in Newark, New Jersey, within the District of New

Jersey, Defendant,

### AUDREY YU,

while under oath as a witness before the Grand Jury in Newark, did knowingly and

intentionally make false material declarations.

120.  Whether the business of Panacom was being conducted at Hudson's offices was material

to the Grand Jury's investigation.

-47-

121.    At the time and place alleged in paragraph 119 above, AUDREY YU, while under oath,

did knowingly declare with respect to the aforesaid material matter, the following:

Question:         Are you aware of any of the business of Panacom
                  being conducted at the offices of the Hudson Realty
                  Management?

Answer:           No.

122.    The aforesaid underlined testimony of AUDREY YU was false, for as she then and there

well knew, Panacom business had been conducted at Hudson's offices.

All in violation of Title 18, United States Code § 1623.

## COUNT ELEVEN
(False Declaration Before a Grand Jury)

123.    Paragraphs 1 through 26 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

124.    On or about September 24, 1999, in Newark, New Jersey, within the District of New

Jersey, Defendant,

**AUDREY YU,**

while under oath as a witness before the Grand Jury in Newark, did knowingly and

intentionally make false material declarations.

125.    Who owned the shares of Panacom was material to the Grand Jury's investigation.

126.    At the time and place alleged in paragraph 124 above, AUDREY YU, while under oath,

did knowingly declare with respect to the aforesaid material matter, the following:

| | |
|---|---|
| Question: | Are you the sole shareholder of Panacom? |
| Answer: | No. |
| Question: | Okay.  Do you own shares yourself? |
| Answer: | I own shares?   Is that your question? |
| Question: | Yes. |
| Answer:<br>Question: | Yes.<br>How many shares do you own? |
| Answer: | I own --- I own fifty percent. |
| Question: | Fifty percent? |
| Answer: | Uh-hum. |
| Question: | And who owns the rest of the shares of that corporation? |
| Answer: | Who owns the other -- no, it was forty percent, forty percent by [the Grand Jury Witness]. |

127.   The aforesaid underlined testimony of AUDREY YU was false, for as she then and there

well knew, The Grand Jury Witness was not the forty percent shareholder of Panacom.

All in violation of Title 18, United States Code § 1623.


## COUNT TWELVE
(False Declaration Before a Grand Jury)

128.   Paragraphs 1 through 26 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.


-49-

129.    On or about September 24, 1999, in Newark, New Jersey, within the District of New

Jersey, Defendant,

**AUDREY YU,**

while under oath as a witness before the Grand Jury in Newark, did knowingly and

intentionally make false material declarations.

130.    Who loaned money for the capitalization of Panacom was material to the Grand Jury's

investigation.

131.    At the time and place alleged in paragraph 129 above, AUDREY YU, while under oath,

did knowingly declare with respect to the aforesaid material matter, the following:

Question:    Ms. Yu, when we left, the last question was, how much
money did [The Grand Jury Witness] contribute to the
corporation. And you had also had the chance to consult
with your attorney at lunch?

Answer:    Yes.

Question:    Okay.  What's the answer to that question?

Answer:    She lended (sic) five hundred fifty thousand.

Question:    Five hundred and fifty thousand.

Answer:    Uh-hum.

Question:    Okay.  And who else had contributed money to the
corporation.

Answer:    She lended (sic) money to me, five hundred fifty thousand.

Question:    To you or the corporation?

Answer:    To me.

Question:    To you?

Answer:    Yes.

| | |
|---|---|
| Question: | Okay. |
| Answer: | <u>And then four hundred fifty thousand she invested.</u> |
| Question: | Okay. So when you say this was your company, was the only money that you put in the five hundred and fifty thousand that you had gotten from [the Grand Jury Witness]? |
| Answer: | <u>Yes.</u> |
| Question: | Okay. Well, do you know why -- let me ask, first of all, who is [the Grand Jury Witness]. |
| Answer: | <u>She's my friend.</u> |

132.   The aforesaid underlined testimony of AUDREY YU was false, for as she then and there

well knew, The Grand Jury Witness had not loaned her $550,000, nor invested $450,000

in Panacom and AUDREY YU was not friends with The Grand Jury Witness.

All in violation of Title 18, United States Code § 1623.


## COUNT THIRTEEN
(Obstruction of the Due Administration of Justice)

133.   Paragraphs 1 through 27 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

-51-

134.   On or about the 17th day of November, 1999, in Bergen County, in the District of New

Jersey, Defendant

### DAVID CHANG

aided and abetted by Defendant
### AUDREY YU,

did corruptly obstruct and impede and endeavor to influence, obstruct, and impede the

due administration of justice in a federal grand jury in the District of New Jersey by

telling The Grand Jury Witness a false story concerning the source of funds used to

capitalize Panacom and instructing her to repeat the false story in her testimony to the

Grand Jury.

All in violation of Title 18, United States Code § 1503 and § 2.


## COUNT FOURTEEN
(Attempting to Corruptly Persuade a Witness To Give False Testimony)

135.   Paragraphs 1 through 27 of the Introduction and Counts One, Two, and Three of this

Second Superseding Indictment are incorporated and realleged by reference herein.

136.   On or about the 17th day of November, 1999, in Bergen County, in the District of New

Jersey, Defendant

### DAVID CHANG,

aided and abetted by Defendant

### AUDREY YU ,

did corruptly persuade and attempt to corruptly persuade The Grand Jury Witness to give

false testimony to the Grand Jury by telling The Grand Jury Witness a false story

concerning the source of funds used to capitalize Panacom and instructing her to repeat

-52-

the false story in her testimony before the Grand Jury, with the intent to influence her testimony before the Grand Jury.

All in violation of Title 18, United States Code, § 1512(b)(1) and § 2.

## COUNT FIFTEEN
### (Obstruction of the Due Administration of Justice)

137.  Paragraphs 1 through 29 of the Introduction and Counts One, Two, and Three of this Second Superseding Indictment are incorporated and realleged by reference herein.

138.  On or about the 27th day of March, 2000, in Bergen County, in the District of New Jersey, Defendant,

### DAVID CHANG,

did corruptly obstruct and impede and endeavor to influence, obstruct, and impede the due administration of justice in a federal grand jury in the District of New Jersey by telling the Panacom Witness a false story concerning a check payable to the Panacom Witness in exchange for a deposit of funds in foreign bank account at DAVID CHANG's direction and instructing the Panacom Witness to repeat the false story if the Panacom Witness was subpoenaed to testify before the Grand Jury.

All in violation of Title 18, United States Code § 1503 and § 2.

## COUNT SIXTEEN
### (Attempting to Corruptly Persuade a Witness To Give False Testimony)

139.  Paragraphs 1 through 29 of the Introduction and Counts One, Two, and Three of this Second Superseding Indictment are incorporated and realleged by reference herein.

140.    On or about the 27th day of March, 2000, in Bergen County, in the District of New

Jersey, Defendant,

## DAVID CHANG,

did corruptly persuade and attempt to corruptly persuade the Panacom Witness to omit

material facts and to give false testimony to the Grand Jury by telling the Panacom

Witness a false story concerning a check payable to the Panacom Witness in exchange

for a deposit of funds in a foreign bank account at DAVID CHANG's direction and

instructing the Panacom Witness to repeat the false story if the Panacom Witness was

subpoenaed to testify before the Grand Jury.

All in violation of Title 18, United States Code, § 1512(b)(1) and § 2.


A TRUE BILL,


ROBERT J. CONRAD, JR.
ACTING UNITED STATES ATTORNEY


BY:

Michael E. Savage
Matthew Friedrich
Trial Attorneys